# CHARLESTON.

## D. P. ELKINS *v.* H. P. TOMPKINS, *et al.*

### Submitted May 23, 1923.   Decided May 29, 1923.

1. BILLS AND NOTES—*Presumed That Parties to Note Contracted Liability According to Legal Effect of Instrument and to Position of Signatures.*

   In the absence of evidence to the contrary, it is presumed that the parties to a note contracted liability according to the legal effect of the instrument and according to the position of their signatures thereto. (p. 140).

2. SAME—*Where Note Indorsed by Payee and Third Party, Legal Inference That Payee First Indorser and Third Party Second Indorser.*

   Where a note has been endorsed by the payee and also by a third party the legal inference from the instrument itself is that the payee is the first endorser and the third party a

second endorser, and it will be so presumed in the absence of evidence to the contrary. (p. 140).

3.  SAME—*Presumption That Payee of Note First Endorser and Third Party Second Indorser May be Rebutted.*

But such legal inference may be repelled; and where the note of a corporation is executed by its general manager, payable to the order of the general manager individually and by him endorsed individually and by a third party, both of whom are stockholders and directors of the corporation, it may be shown by facts and circumstances attending the execution of the note that the endorsers intended to be equally bound as between themselves. (p. 141).

4.  EVIDENCE—*Conduct Held Admission of Liability Under Judgment.*

However, the inference to be drawn from such facts and circumstances may be repelled by the subsequent conduct of the payee; and if the note be reduced to a joint judgment against the corporation and the two endorsers and thereafter a lien creditors' suit is instituted to enforce collection thereof out of the payee's property, and during the pendency of the suit substantial payment is made thereon out of the payee's property and afterward by his consent a decree is entered therein in favor of the second endorser against the payee for a large sum of money, without making any deduction or claim for deduction therefrom because of the second endorser's liability to the payee for his share of the amount paid upon said judgment, the payee's conduct will be construed as an admission on his part, in the absence of evidence to the contrary, that as between him and the second endorser, the judgment is his debt alone. (p. 141).

Appeal from Circuit Court, Kanawha County.

Suit by D. P. Elkins against H. P. Tompkins and others. From a decree for plaintiff, the executors of H. P. Tompkins appeal.

*Affirmed.*

*Conley & Johnson,* for appellants.

*Malcolm Jackson* and *Horan & Pettigrew,* for appellee.

MEREDITH, JUDGE:

By decree entered by the circuit court of Kanawha County on August 11, 1922, the estate of H. P. Tompkins, deceased,

was directed to pay to the estate of J. G. W. Tompkins, deceased, the balance owing on a certain trust lien debt amounting to $38,156.55, and it was denied any relief by way of contribution for the amount paid on a certain judgment by H. P. Tompkins and his estate, rendered by the same court at its March term, 1892, in favor of Kanawha Valley Bank for $15,165, principal with interest thereon from April 6, 1892, and $21.00 costs, the executors of the estate of H. P. Tompkins claiming that the estate of J. G. W. Tompkins was liable for half of the judgment except a payment thereon of $1500. H. P. Tompkins' executors appeal.

The trust lien debt of $38,156.55 is not denied; appellants merely seek to off-set against it one-half of the bank judgment mentioned (except the sum of $1500 paid thereon by J. G. W. Tompkins' executrix,) which was paid by them and their decedent. This judgment was originally based on certain notes bearing the signature "Cedar Grove Mills, by H. P. Tompkins, Manager", made payable to the order of H. P. Tompkins, endorsed by him, and below his endorsement followed the endorsement of J. G. W. Tompkins. These notes in varying amounts have been traced back to 1885. They were renewed from time to time; suit was instituted thereon in October, 1888; a settlement was made by renewals, and finally, on February 1, 1892, an action was prosecuted to final judgment. Cedar Grove Mills was a corporation organized in 1880. It constructed a building at Cedar Grove on land leased to it by H. P. Tompkins. He and his brother, J. G. W. Tompkins, were stockholders and directors, the former having subscribed for 13 and the latter for 5 shares of its capital stock, out of a total of 39 shares of $50 each. It was evidently a losing venture from the start, if it really ever got a start. The cost of the building, before its construction, was estimated at $2611.10; the actual cost is not disclosed, nor is there any evidence on the record showing that the company did any business, except the borrowing of money; nor does it clearly appear whether the proceeds of the notes upon which the judgment was based were paid to and used by the corporation.

It is contended by the appellants, the executors of the

estate of H. P. Tompkins, deceased, that the two brothers were jointly interested in the enterprise; that they were likewise jointly interested in raising funds for the corporation; that these funds were so raised by their joint, not their several endorsement, upon the company's notes, upon which the judgment was had, and that therefore, their liability on the notes, as between themselves, was joint; that a joint judgment was rendered against them; hence each was liable for a half thereof; that appellants and their decedent having paid all the judgment, except the sum of $1500 which was paid by defendant, appellants are entitled to be repaid half of the sums paid by them or their decedent, or have the amount thereof credited upon the debt concededly owing by the estate of H. P. Tompkins to the estate of J. G. W. Tompkins. Of course, if the liability be conceded, then appellant's right to enforce payment must also be conceded. But the executrix of the estate of J. G. W. Tompkins denies liability and the circuit court sustained her. Appellants rely upon *Plumley* v. *First National Bank,* 76 W. Va. 635, 87 S. E. 94, as fixing liability upon defendant's decedent. It was there held:

> "Accommodation endorsers are prima facie liable to one another in the inverse order of their endorsements, but, if they endorse under an agreement to to be equally liable, in case of default on the part of the maker, they are treated as his sureties in the adjustment of ultimate rights and liabilities among themselves.
>
> "Such an agreement need not be in writing nor formal. It may be inferred from facts, circumstances and conduct attending the transaction and shown by parol evidence."

Appellants do not attempt to show any express agreement between the two brothers to the effect that they would be equally liable. Looking to the notes and the endorsements thereon alone, J. G. W. Tompkins would not have been liable to H. P. Tompkins for re-payment, as his endorsement appears to be subsequent to that of H. P. Tompkins. There is no evidence, other than that of the notes, showing the order of endorsements thereon, and they clearly show that J. G. W.

Tompkins' endorsement is below that of H. P. Tompkins. Prima facie, J. G. W. Tompkins is a second endorser. In the absence of evidence to the contrary, it will be presumed that the parties to a note contracted liability according to the legal effect of the instrument, and according to the position of their signatures. *Polhemus* v. *Prudential Realty Corporation,* 74 N. J. L. 570, 67 Atl. 303; *Lord* v. *Moody,* 41 Me. 127; *Beem* v. *Farrell,* 135 Ia. 670, 113 N. W. 509; *Bank* v. *Burch,* 145 N. C. 316, 59 S. E. 71; *Willis* v. *Willis,* 42 W. Va. 522, 26 S. E. 515. And where a note has been endorsed by the payee and also by another party, the legal inference from the instrument itself is that the payee is the first endorser, and it will be so presumed in the absence of evidence to the contrary. *Cady* v. *Shepard,* 12 Wis. 639; 8 C. J. page 1009. Hence the presumption is that J. G. W. Tompkins was liable only as second endorser, as between him and his brother. Counsel for appellants concede that there is no proof in the record of any express agreement between the Tompkins brothers that would bind J. G. W. Tompkins to pay one-half of the notes; but insist that such an agreement may properly be inferred from the facts and circumstances shown. Unfortunately the Tompkinses are dead, both dying in 1907; the notes in question were executed more than a third of a century past; and the parties to this cause have been compelled to rely almost wholly on the records of the corporation, and on certain other papers, executed by the Tompkins brothers both prior and subsequent to the execution of the notes and upon the conduct of the parties in relation to the judgment in question. The corporate records are silent as to the execution of the notes. They do not show whether the company received the proceeds or not, and there is nothing in this record to show who got the proceeds. From the notes themselves we might infer that H. P. Tompkins got the proceeds; but for the moment let us dismiss that inference. In the Plumley case, supra, the trial court found that the notes were executed for corporate purposes. In our view of the instant case we deem it unnecessary to determine whether the notes on which the judgment was based were executed for the benefit of the corporation, or whether it got

the proceeds.    We think the conduct of the parties, after the judgment was obtained, is decisive of the question of liability as between the Tompkins brothers.    Fortunately, the written records on that question tell a plain, though circuitous and lengthy story, which it is necessary to state in order.    It is too long to give the details, but the main facts are substantially as follows:

H. P. Tompkins owned a' large quantity of land.    Prior to December 15, 1891, it had become heavily encumbered by way of judgments and deeds of trust, and D. P. Elkins had brought this suit, a general lien creditors' suit, to have the lands sold.    Among these deeds of trust were the following:

> 1.    A trust deed dated October 20, 1886, to Edward B. Knight, Trustee, covering a 190 acre tract, to secure ten notes made by Cedar Grove Mills, a corporation, aggregating $16,200, payable to the order of H. P. Tompkins and by him endorsed to New Hampshire Trust Company.
>
> 2.    A trust deed dated January 10, 1889, made to J. G. W. Tompkins, Trustee, covering 105 building lots at Cedar Grove, to secure to New Hampshire Trust Company the payment of its debts described in the preceding deed of trust; giving the trustee the power to sell either at public or private sale, and after paying the debt to said Trust Company, then to apply the remaining proceeds to the "payment of any other liens, if any there be now of record against said property or that may hereafter come upon the same in the order of their priority."
>
> 3.    A trust deed dated October 12, 1887, to E. B. Knight, Trustee, covering two tracts, one of 190 acres and another of 300 acres, to secure J. G. W. Tompkins in the payment in three years from date of the sum of $13,748.74, and "to secure and save harmless the said J. G. W. Tompkins from all loss, cost or damage by reason of any and all liability now existing against the said J. G. W. Tompkins as surety for any debt or debts of the said H. P. Tompkins."
>
> 4.    A trust deed dated June 16, 1891, to James F. Brown, Trustee, to secure to J. G. W. Tompkins the payment of the same debt mentioned in the preceding trust deed, and to correct the description of the two tracts of 190 and 300 acres conveyed thereby,

"and also to indemnify and save harmless the said J. G. W. Tompkins as indorser or surety of the said H. P. Tompkins."

5. A trust deed dated October 3, 1889, made to Malcolm Jackson, Trustee, assigning and transferring all the rents and royalties due and to become due to H. P. Tompkins from Cedar Grove Milling Company by virtue of a certain coal mining lease made to it by him, dated September 1, 1883, to secure the payment of a claim and certain judgments rendered against H. P. Tompkins and Cedar Grove Mills, with authority to collect the rents and royalties. These judgments were the following:

(b)    A judgment in favor of Nordyke & Mormen Co. for $1177.75, against H. P. Tompkins and T. B. Swann.

(b).    A judgment in favor of Nordyke & Normen Co. against H. P. Tompkins and Cedar Grove Mills for $181.71.

(c).    Two confessed judgments in favor of James F. Brown against H. P. Tompkins for $358.20 and $637.79, respectively.

(d).    A claim against Cedar Grove Mills in favor of Leonard Goff for $454.84.

The chancery cause of *D. P. Elkins* v. *H. P. Tompkins* and others was referred to Commissioner Geo.. W. McClintic, December 15, 1891, to ascertain the property owned by H. P. Tompkins and liens thereon. He filed his report July 17, 1894; between the date of the reference and the filing of his report the Kanawha Valley Bank had obtained its judgment, the subject of the present controversy. The commissioner, among other things, reported the debt of New Hampshire Trust Company, as of March 10, 1894, at $15,000.74; the trust lien debt owing J. G. W. Tompkins as of the same date at $17,541.99, having credited thereon the sum of $1500, the price of certain real estate sold to J. G. W. Tompkins by H. P. Tompkins; he also reported the judgment of the bank against Cedar Grove Mills, H. P. Tompkins and J. G. W. Tompkins to be $16,864.25, based on the original judgment of $15,165, principal and $21.00 costs, with interest from April 6, 1892. On motion of H. P. Tompkins, this report was recommitted

to Commissioner McClintic who, on May 29, 1903, reported the New Hampshire Trust Company debt was assigned to E. A. Reid, and fixed the amount in the alternative as either $13,547.61 or $12,955.94, as of October 1, 1902, there being a controversy as to the correct calculations. Certain payments had been made thereon since the first report in 1894. The trust lien debt of J. G. W. Tompkins was reported as of October 1, 1902, at $24,595.10, there being no credit thereon except the sum of $1500 formerly allowed, the difference in the amounts reported being due to accrued interest. The Kanawha Valley Bank judgment was reported at $24,624.78, the increase being due to accrued interest. To this report H. P. Tompkins filed twenty-one exceptions. The tenth exception was that the trust lien debt of J. G. W. Tompkins should be credited with $2000, the interest of H. P. Tompkins in his mother's estate conveyed by him to J. G. W. Tompkins and also three payments made by H. P. Tompkins to Union Central Life Insurance Company, on March 15, 1887, 1888, and 1889, of $621.09, each, and assigned to J. G. W. Tompkins; the thirteenth exception was that then judgment of Kanawha Valley Bank should be credited with the amounts of royalties received by Malcolm Jackson, Trustee, except about $1800, payable to Mrs. P. G. Jackson, and which royalties should have been credited on the judgment; that the exceptamt could not know the amount received by the trustee applicable to that judgment until the trustee should settle his accounts; the fifteenth exception was to the effect that the reported trust lien debt of E. A. Reid, assignee of New Hampshire Trust Co., had been greatly reduced by payments made thereon by Special Commissioner George S. Couch, from the proceeds of sales of town lots at Cedar Grove, sold pursuant to decrees in the cause. While the cause was before Commissioner McClintic and he was making his second report, H. P. Tompkins and J. G. W. Tompkins testified as witnesses. H. P. Tompkins testified. on January 28, 1898, in relation to the judgment of the Kanawha Valley Bank as to what provision he had made for its payment; that many years before he had assigned to Malcolm Jackson, Trustee, the benefit of all rents and

royalties under a lease made by him to Cedar Grove Mining Company, which lease produced a minimum rent of $2000 payable quarterly; that this was his last assignment of these royalties and he did not know the amounts collected and applied on the bank's judgment; that as to another judgment of the same bank, dated January 8, 1885, for $5796.79, against him and W. H. Tompkins, he, H. P. Tompkins, was only an accommodation endorser, and that that judgment has been set up as a lien against the real estate of W. H. Tompkins in the chancery cause of *Barbour, Stedman & Herod* v. *W. H. Tompkins and others;* that the New Hampshire. Trust Company debt assigned to Reid, was to be paid out of the proceeds of the sale of H. P. Tompkins' real estate, and that it had been greatly reduced by sales of town lots made by Couch, special commissioner. It is observed that while he was careful to state that he was only an accommodation endorser for W. H. Tompkins on the Kanawha Valley Bank judgment of $5796.79, he made no claim that J. G. W. Tompkins was jointly liable with him for the payment of the bank's judgment against the two brothers and Cedar Grove Mills, reported in the second report at $24,624.78; in his exception he merely complains of the failure of the commissioner to ascertain the amounts of royalties which should have been collected and paid thereon by Malcolm Jackson, Trustee. Upon his exceptions, the case was recommitted to Commissioner McClintic, and on April 23, 1904, he filed his third and last report. Again H. P. Tompkins and J. G. W. Tompkins both testified before the commissioner, but H. P. Tompkins made no claim that his brother's trust lien debt should be credited with any payment except the sum of $1500 theretofore allowed, nor does it appear that he made any claim that his brother was as to him bound to pay any part of the Kanawha Valley Bank judgment. This last report shows that Malcolm Jackson, Trustee, had collected royalties to the amount of $6246.38 and paid them on the bank's judgment, reducing it to $19,906.44, as of April 25, 1904. Had J. G. W. Tompkins as between him and H. P. Tompkins been liable for half of the bank judgment, then the J. G. W. Tompkins trust lien should have been reduced by half of the pay-

ments made on the bank judgment by Malcolm Jackson, Trustee, out of H. P. Tompkins' royalties, or by $3123.19; but no such claim was then made by H. P. Tompkins, nor at any time afterwards during his life. The trust lien debt of J. G. W. Tompkins was in the third report fixed at $25,-887.48, as of April 25, 1904. On May 28, 1904, a consent decree, signed by H. P. Tompkins and J. G. W. Tompkins was entered in the cause, fixing the amounts of the various liens against H. P. Tompkins' lands; the third lien was the balance of a judgment in favor of John Q. Dickinson for $1070.37; the fourth was the trust lien debt of J. G. W. Tompkins for $25,887.48; the fifth was the balance of a judgment of Kanawha Valley Bank against H. P. Tompkins and T. B. Swann for $613.29, and also the balance of a judgment against H. P. Tompkins and Kanawha Cannel Coal Company, for $251.59; the eleventh was the balance of a judgment in favor of John Q. Dickinson for $266.44; the fifteenth was the balance on the judgment of Kanawha Valley Bank amounting to $19,905.60, recovered at the March term, 1892, against Cedar Grove Mills, H. P. Tompkins and J. G. W. Tompkins. Some of these liens were given different priorities as to different parcels of land, but no further statement in that respect is necessary here. There was a money decree in favor of these various creditors against H. P. Tompkins, and his lands were directed to be sold by special commissioners Couch and Black.

After the special commissioners had advertised the lands for sale, H. P. Tompkins, J. G. W. Tompkins, the Kanawha Valley Bank and John Q. Dickinson agreed in writing, under date of August 19, 1905; (1) that the public sale of the lands by the special commissioners should be withdrawn and no public sale should be made by them before April 1, 1906; (2) that the withdrawal of sale should not affect, alter or impair the rights of any of the parties to the suit, and especially that it should not release J. G. W. Tompkins or H. P. Tompkins or any other defendant from their liabilities as sureties upon any of the lien debts established in the cause, nor should it affect or alter the priorities of the liens except as thereinafter provided ;(3) that J. G. W. Tompkins, in consideration

of the withdrawal and discontinuance of sale, agreed that when his trust lien debt of $25,887.48 should be reached in the distribution of funds in the cause, the funds so applicable to the payment of his debt should be paid over on the subsequent liens allowed in the decree to Kanawha Valley Bank and J. Q. Dickinson until they should be fully paid, the proceeds of his trust lien debt to be first applied to the payment of the judgment of the bank which is joint against J. G. W. Tompkins, H. P. Tompkins and Cedar Grove Mills; and the bank and Dickinson agreed to assign to J. G. W. Tompkins their said subsequent liens or such proportions thereof as should be paid out of the funds applicable to the trust lien debt of $25,887.48 due J. G. W. Tompkins; (4) that Couch, special commissioner, should make settlement of his accounts of lots sold, and cash and notes received, and whatever moneys should remain in his hands above the sum necessary to pay the New Hampshire Trust Company, should be paid to the bank upon its judgment next in priority; that was the bank's judgment against H. P. Tompkins and W. H. Tompkins heretofore mentioned; that the notes held by Commissioner Couch for the deferred payments on the lots sold by him should be collected, and their proceeds applied to the payment of the bank's last mentioned judgment, and when it should be paid in full, then to the judgment of J. Q. Dickinson of $1070.37; (5) that Commissioners Black and Couch should proceed to sell the lots and property of H. P. Tompkins at private sale, and the proceeds thereof should be disposed of in like manner as the funds and notes then in the hands of Commissioner Couch.

Appellants make much of this agreement, but if it has any effect upon the relation of the two Tompkins brothers to the bank's judgment, it seems to us rather to confirm the obligation of H. P. Tompkins to pay it in full to the relief of J. G. W. Tompkins. It merely provided for an exchange of priorities between J. G. W. Tompkins on the one hand with the bank and Dickinson on the other, and when the liens of the latter should be paid they were to assign their claims to him. Why this provision for assignment, if J. G.

W. Tompkins was to pay half of the bank's judgment? There was no provision made by which J. G. W. Tompkins' ultimate claim was to be reduced or credited with any such payments. The agreement appears to have been substantially carried out.

J. G. W. Tompkins died July 8, 1907, and H. P. Tompkins died November 12, 1907. Upon the death of Commissioner George S. Couch, George E. Price was substituted in his place. The suit was properly revived and on August 3, 1911, Commissioners Black and Price reported to the court that they had leased certain lands belonging to H. P. Tompkins, deceased, and collected rents and royalties therefrom to the amount of $16,698.31, and sold certain gas interests for $40,-000, making a total of $56,698.31; that they, with the other commissioners appointed in the suit had succeeded in paying all the claims against the estate, as fixed by the decree of sale, except two small claims whose owners they could not find; that they had paid the judgment of Kanawha Valley Bank against Cedar Grove Mills, H. P. Tompkins and J. G. W. Tompkins; the claim of the bank against W. H. Tompkins and H. P. Tompkins; also the claim of John Q. Dickinson against H. P. Tompkins; "and that there has been paid to Nellie B. Tompkins, executrix of the estate of J. G. W. Tompkins, all of the claim of J. G. W. Tompkins against the said H. P. Tompkins estate, as shown in the decree of sale entered in this cause, except an amount equal to one-half of the judgment of the Kanawha Valley Bank against Cedar Grove Mills and H. P. Tompkins and J. G. W. Tompkins, both said last named persons being endorsers upon the notes upon which said judgment was taken and from the papers both appear jointly liable for the payment thereof, the said H. P. Tompkins estate having paid the same out of funds realized from the sale of the gas interests in said lands and lots and other lands sold under authority" of the court; that there was in their hands at least $20,000, and which was considered sufficient to pay any outstanding claims against the estate of H. P. Tompkins, deceased; that they had been notified by the heirs of H. P. Tompkins not to pay the residue of the claim

of the J. G. W. Tompkins estate and they ask for direction by the court as to disbursement of the funds remaining in their hands.

At August rules, 1921, the executors of the estate of H. P. Tompkins, deceased, filed their petition, setting up some of the matters hereinbefore mentioned and claimed that there had been paid by them or their decedent either on the J. G. W. Tompkins debt or on the Kanawha Valley Bank judgment the sum of $25,732.99, all of which should be credited against the J. G. W. Tompkins trust lien debt and ask that commissioners Price and Black only be required to pay the balance on said debt after allowing the credits mentioned; they concede that the executrix of J. G. W. Tompkins paid on the bank judgment on March 31, 1908, the sum of $1500, which is taken into account in their statement; the executrix of the estate of J. G. W. Tompkins answered the petition and set up other matters also heretofore mentioned. The issue was squarely presented whether J. G. W. Tompkins was liable for any part of the said Kanawha Valley Bank judgment as between J. G. W. Tompkins and H. P. Tompkins. We have as far as practicable stated the pertinent facts in order of time as they occurred.

We therefore start with the presumption, as heretofore stated, that H. P. Tompkins was a first endorser, and that J. G. W. Tompkins was a second endorser, upon the notes upon which the Kanawha Valley Bank's judgment was based. Bearing in mind that no express agreement to the contrary has been shown, counsel for H. P. Tompkins' estate nevertheless urge that this presumption is off-set by the facts and circumstances shown during the period the Cedar Grove Mills was doing business and during the renewal period of these notes. If that were all, their contention might be sound, though we are not so sure about that. It occurs to us that the record shows that H. P. Tompkins was the moving spirit in Cedar Grove Mills; that it was his enterprise. True, J. G. W. Tompkins was a stockholder and director; but the building was erected on lands leased to it by H. P. Tompkins; he was its general manager and, we think, in the full

sense of that term; he executed its notes as general manager; he conveyed his own property to secure a loan of $16,200 from New Hampshire Trust Company, evidenced by the note of Cedar Grove Mills and endorsed by him, but not endorsed by J. G. W. Tompkins or anyone else interested in the company; this debt he paid out of his own property without protest; he also paid a number of other claims against Cedar Grove Mills, upon some of which, so far as the record shows, he was not personally liable; true, the Kanawha Valley Bank's judgment against him and his brother and the company was a joint judgment and the bank had a right to collect it from either or all, if it could, but that alone would not make J. G. W. Tompkins liable to repay his brother for the amount he had paid, if, in fact, J. G. W. Tompkins was a second endorser on the notes. But aside from all this, it appears to us that the conduct of H. P. Tompkins during the pendency of the chancery cause, when his creditors were trying to sell his property to pay his debts, is a very strong admission on his part that the bank's judgment, as between him and his brother, was his debt alone. His failure to have his brother's large trust lien reduced by a credit of $3123.19, moneys paid out of royalties belonging to H. P. Tompkins, by his trustee to the bank upon this judgment, and at the same time agreeing in writing that his brother's debt, amounting to $25887.48, might be decreased as a debt against him, in such an admission of record in the cause as would thereafter estop H. P. Tompkins from claiming that his brother was to be held liable to reimburse him for any payment H. P. Tompkins might make on the bank's judgment.

Another strong circumstance is this: so far as the record shows, H. P. Tompkins in life never so much as hinted that, as between him and his brother, his brother J. G. W. Tompkins was to pay any part of this judgment. The claim was, during his life, in suit for over fifteen years, yet there was not a word said about it; on the contrary, it occurs to us that the record made by him affirmatively shows that he did not expect his brother to relieve him of a single dollar of that judgment. All these facts and circumstances, and

especially the conduct and tacit admission of H. P. Tompkins shown by the record clearly repel any inference of joint liability that might be drawn from the fact that the two brothers were stockholders and directors in the corporate enterprise when the notes were executed.

But this is not all. Both principals are dead. Whatever testimony either might state, if alive, is lost. The estate of H. P. Tompkins has the affirmative of the issue and must bear the burden of proof. This it has failed to do. Again, the executors of his estate waited for nearly thirteen years after the death of both brothers before making any effort to have the matter in controversy litigated. It is claimed they could not do anything until the bank's judgment was paid; that might be so, though we do not concede it. But dismissing the question of laches, we think that the decree of the circuit court was clearly right on the merits; that the debt in question never was the debt of J. G. W. Tompkins, as between him and his brother.

For the foregoing reasons, the decree is affirmed.

*Affirmed.*